**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JACKSON GREEN,**<br><br>**Defendant.** | **Case No. 24-cr-00062 (ABJ)** |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Mr. Green has no ties to our community. He came to this community to commit crimes and was paid for doing so. In November 2023, Mr. Green entered the National Gallery of Art—which had previously been victimized by his co-conspirators—and smeared paint on an exhibit of the 54th Massachusetts Regiment. He damaged the exhibit, he inconvenienced the Gallery visitors, and he caused lasting pain to the Gallery's employees. Mr. Green was arrested, charged, and released with the condition that he not enter museums and that he leave our community. But Mr. Green did not leave. Just eight days later, Mr. Green and a co-conspirator entered the National Archives and exploded paint powder over the display of the U.S. Constitution. He caused damage in excess of $50,000, terror to the staff and visitors who had no idea what substance Mr. Green was spreading, and loss to the hundreds of visitors who could not visit the Archives during the four days it was closed. Mr. Green has refused through the pendency of this case to abide by court-ordered conditions of release. He has never expressed any remorse, most times treating this Court's proceedings as an amusement.   For the following reasons, the Government requests that the Court sentence Mr. Green to two years' incarceration, followed by three years of supervised release, to include stay-away orders from Washington, D.C. and museums, and community service.[1]

---

[1] The Government is submitting along with this memorandum, a Victim Impact Statement from

**BACKGROUND**

Jackson Green is a member of Declare Emergency, a group of activists that purport to raise awareness regarding climate change and by engaging in a variety of criminal offenses, primarily in Washington, D.C.   The number of active members of Declare Emergency has changed over time, but it appears there are approximately six core members with additional members joining specific meetings or events on an *ad hoc* basis.   Declare Emergency Records reflect that Mr. Green was an active member of Declare Emergency since at least January 2023.   *See Exhibit A*, January 8, 2023 Meeting Minutes.[2]   Mr. Green participated in two attacks with other members of Declare Emergency:   a November 2023 attack at the National Gallery of Art and a February 2024 attack at the National Archives.

### *The November 14, 2023 Attack at the National Gallery of Art*

On  November  14,  2023,  Jackson  Green  and  other  members  of  Declare  Emergency, including  Donald  Zepeda,  entered  NGA.  Green  and  Zepeda  walked  around  NGA  before approaching  Augustus  Saint-Gaudens  "*The  Shaw  54th  Regiment  Memorial*."  The  mural commemorates the Civil War efforts of 54th Massachusetts Volunteer Infantry, which was one of the  first  regiments  of  African  Americans  in  our  country's  history.  The  mural  was  completed  in 1900 by Augustus Saint-Gaudens. The mural has been on long-term loan to NGA from the National Park Service's Saint-Gaudens National Historic Park since 1997. The Superintendent of

---

the Archivist of the United States on behalf of the National Archives and Records Administration. The National Gallery of Art is in the process of finalizing their statement and the Government anticipates filing that statement no later than Friday, November 1, 2024.

[2] Mr. Green refers to himself by the name "Kroegeor"

2

the Saint-Gaudens National Historic Park estimated the value of the mural to be between $6 and $7 million.

After approaching the mural, Green hand-painted "Honor Them" in red paint on the wall next to the mural, below the names of the Regiment.

***<u>Figure 1</u>***

Zepeda and other members of Declare Emergency filmed Mr. Green's offense. Specifically, surveillance video reflects that Zepeda was positioned in the mural room prior to Green entering. As Green walked around the room, Zepeda already had his phone out to film Green's actions. Zepeda (yellow circle) positioned himself in a corner of the room to allow himself the best angle to film Green's (red circle) actions.

*Figure 2*



Zepeda's film was then shared by Declare Emergency on social media.

*Figure 3*



NGA reported that it cost $706 to repair the damage.

Green was interviewed after the offense and waived his *Miranda* rights.   Green admitted to the offense and stated that he pained the wall to draw attention to climate change.   He stated he was homeless.   He had his attorney's name drawn on his body in marker.   In addition to his oral statements, Green made a written statement in which he admitted to the offense and provided details of his motives.

On February 1, 2024, Mr. Green was indicted on one count of Damage to National Gallery of Art Property in violation of 18 U.S.C. §§ 6303, 6307, and a warrant was issued for his arrest.

### *Mr. Jackson's Initial Appearance*

On February 6, 2024, Mr. Green self-surrendered and made his initial appearance before the Honorable G. Michael Harvey.   Judge Harvey ordered Mr. Green released subject to certain conditions.   Mr. Green was ordered not to violate any federal, state, or local law while on release. *See* ECF No. 7 at 1.   Additionally, Mr. Green was ordered to stay-away from Washington, D.C. and also to stay away from all museums and public monuments.   *See* ECF No. 7 at 3.   Notably, this stay-away was included over defense objection and following extensive argument.   Mr. Green, while under oath, stated that he understood these conditions and agreed to them.   When Mr. Green indicated some hesitation with respect to his stay-away order, Judge Harvey indicated that he could alternatively order pretrial detention.

Mr. Green proceeded to sign his release conditions twice.   *See* ECF No. 7 at 4 and 6.   In doing so, he acknowledged he was aware of the conditions of release and promised to abide by them.   *Id.*

**_The February 14, 2024 Attack at the National Archives_**

Despite his express acknowledgment of his release conditions, on February 14, 2024, Jackson Green and Donald Zepeda entered the National Archives at 700 Pennsylvania Avenue NW. Green (circled in yellow) and Zepeda (circled in red) stood in front of the display of the U.S. Constitution and emptied bags containing red powder on themselves and the case.

**_Figure 4_**



As they did so, both made statements concerning climate change.

Green and Zepeda's offense was filmed by a reporter and shared over social media, including by other members of Declare Emergency. Their offense was also captured on National Archive surveillance video.

Mr. Green was arrested, identified himself by name, and was informed of his rights, including his _Miranda_ rights.  Mr. Green waived those rights in writing and was interviewed.

During the interview, Mr. Green was still covered in powder and some of the powder rubbed off on the *Miranda* waiver.

Green admitted to entering the National Archives and exploding a balloon containing red tempera paint powder over himself and the case containing the Constitution, the Declaration of Independence, and the Bill of Rights.   At the time of the interview, Green was wearing a t-shirt with the name "Declare Emergency" on it.   Green stated that he was seeking to raise awareness to the issue of climate change and that President Biden should immediately declare a state of climate emergency.

The National Archives was closed as a result of this attack from February 14, 2024 to February 17, 2027 to allow for repairs. The National Archives reported that it cost approximately $58,646.25 to repair the damage.

The U.S. Constitution was famously hand-penned and signed on September 17, 1787 at the Constitutional Convention at Independent Hall in Philadelphia. It is indisputably priceless. Immediately following the signing of the Constitution, thirteen copies were made, one for each of the then thirteen states. In November 2021, one of the eleven surviving copies of the thirteen sold at an auction for $43.2 million.[3] The original Constitution is singular and would undoubtedly be valued significantly higher than such a copy. The Rotunda and casing in which the Constitution was housed are also historically valuable. The National Archives Building is a National Historic

---

[3] Megan C. Hills, *First-edition copy of US Constitution sells for record $43.2 million*, CNN (November 19, 2021), available at: https://www.cnn.com/style/article/us-constitution-sothebys-sale/index.html#:~:text=An%20exceptionally%20rare%20first%2Dedition,ever%20to%20sell%20at%20auction.

Landmark—designed to serve as a shrine to the Constitution and other founding documents, with custom marble and intricate brass work throughout.

When Zepeda and Green were processed following their arrest they were still covered in red powder.



*Figure 5*



Following their arrest, outside of D.C. Superior Court, Green and Zepeda were interviewed by Georgetown University's student newspaper *The Hoya*.[4]

---

[4] *See* Ruth Abramovitz, *Climate Activists Protest at National Archives, Cover Constitution Display with Dust*, The Hoya (February 22, 2024), available at https://thehoya.com/news/climate-activists-protest-at-national-archives-cover-constitution-display-with-dust/.

*Figure 6*



During that interview, Zepeda is reported to have said that despite the backlash from the public and authorities, Declare Emergency intended to ramp up the scale and impact of their demonstrations. He is quoted as stating: "For a while now, I've kind of known that this sort of thing needs to be scaled up if we want to succeed at the scale and pace that we need to address the climate emergency."

### *The Revocation of Mr. Green's Release*

On February 15, 2024, the Government moved to revoke Mr. Green's conditions of release and the Court issued a warrant for his arrest.    On February 16, 2024, Mr. Green appeared in Court, still covered in red powder from his attack on the Constitution.    Mr. Green was detained until a hearing on February 21, 2024, when the Court heard testimony from a law enforcement officer and ultimately revoked Mr. Green's release conditions.

Following his revocation, the parties and the Court labored to fashion conditions of release that would allow Mr. Green to remain out of jail while still safeguarding the community and

ensuring his compliance with court orders. After many weeks, the parties and the Court fashioned release conditions including releasing Mr. Green to two third-party custodians, placing him on the High Intensity Supervision Program, and permitting him to work on a farm in Virginia. Despite this, Mr. Green did not comply with his conditions, wandering through the town in which he was living, and being stopped by police. Both of Mr. Green's third-party custodians ultimately decided that they no longer wished to monitor Mr. Green.

On August 15, 2024, Mr. Green pled guilty, without a plea agreement, to both counts of the indictment against him. Despite that, he immediately violated his conditions of release, wandering around Washington, D.C., including around the monuments which he was barred from visiting. At a hearing held on August 30, 2024, Mr. Green indicated to the Court that he would not abide by his release conditions and was remanded into custody.

### *The Pre-Sentence Investigation Report*

The Pre-Sentence Investigation Report (PSIR) summarizes Mr. Green's personal, educational, and criminal history. Mr. Zepeda is 27 and was born in Salt Lake City, Utah.   PSIR at ¶ 65. He was initially raised by both parents but then primarily by his mother after his parents divorced when he was 8. *Id.* Mr. Green described his childhood as both "privileged" and "tumultuous." PSIR at ¶ 68. He reported that his material needs were met but noted some disorder in his home. *Id.* Mr. Green graduated from high school and received an associate degree from Salt Lake City Community College. PSIR at ¶ 90. He was a registered nurse's assistant though his certification has lapsed. PSIR at ¶ 92.

Mr. Green has lived in Mexico, Virginia, Washington, D.C., and Washington State. PSIR at ¶ 71. It is not clear that Mr. Green has a residence to which he can be released. Mr. Green reports

that he struggles with an eating disorder. PSIR at ¶ 82. Mr. Green does not appear to suffer from any substance abuse issues. PSIR at ¶¶ 87-89.

While Mr. Green was on pre-trial release, he had been working as a farm hand at a farm in Virginia for approximately three months. PSIR at ¶ 96. Prior to that, from December 2023 through March 2024, he was paid by Declare Emergency in what he described as "an outreach position." PSIR at ¶ 97. Mr. Green has held various other jobs as a nurse's assistant, and at homeless shelters. PSIR at ¶¶ 98-101.

Mr. Green has no criminal convictions. PSIR at ¶¶ 56-59.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal

conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(i) issued by the Sentencing Commission . . .; and

(ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission . . . and

(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the

district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

U.S.S.G § 2B1.1 applies to the offense as it involved "Property Damage or Destruction." U.S.S.G § 2B1.1(c)(4) provides that: "if the offense involved a cultural heritage resource or a paleontological resource, apply §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources)." A "cultural heritage resource" is defined, *inter alia*, as "an object of cultural heritage, as defined in 18 U.S.C. § 668(a)(2)." Section 668(a)(2) in turn defines "object of cultural heritage" as "an object that is . . . over 100 years old and worth in excess of $5,000 . . . or . . . worth at least $100,000." The Shaw Memorial—which is 124 years old and is worth between $6 and $7 million qualifies under either prong. As does the U.S. Constitution, which is 237 years' old and is worth at least $43.2 million (though likely significant more).

13

Therefore, the question for the Court is whether these offenses "involved" the Shaw Memorial and the U.S. Constitution. The phrase "involved" is not defined in the Guidelines. "In interpreting the Sentencing Guidelines, the Court applies the ordinary tools of statutory interpretation and looks to the plain meaning of its terms." *United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022). *See also United States v. Williams*, No. CR 21-618 (ABJ), 2024 WL 1239989, at *2 (D.D.C. Mar. 22, 2024) (looking "to the plain meaning of the term at the time the provision was enacted" in interpreting the meaning of a Sentencing Guidelines provision). "To discern the text's plain meaning, courts look to dictionary definitions and analyze the word or phrase in context." *Seefried*, 639 F. Supp at 10.

Merriam Webster defines "involved" as "having a part in something; included in something."[5] The Oxford English Dictionary defines involved as "contained by implication, implicit."[6] Based on its plain meaning, Mr. Green's offenses "involved" the Shaw Memorial and the U.S. Constitution.

With respect to both offenses, Mr. Green planned with others to target specific cultural objects.  He entered NGA with the purpose of smearing paint on the Shaw Memorial exhibit. This is obvious from the words he chose to write "Honor Them," and the clearly pre-planned statement released by Declare Emergency contemporaneously with the offense: "To honor the sacrifices of the 54th regiment we must sacrifice ourselves today."  The same is true of Mr. Green's attack on the U.S. Constitution.  He, along with Mr. Zepeda, entered the National

---

[5]  Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/involved (last visited April 17, 2024).

[6]  *Involved*, Oxford English Dictionary, https://www.oed.com/dictionary/involved_adj?tab=meaning_and_use#17982 (last visited April 17, 2024)

Archives with the purpose and intent of targeting the case containing the U.S. Constitution. He could have spread paint powder in a roadway, in a park, in any other building: he chose this building and this object. He stood in front of the U.S. Constitution and not one of the many other exhibits in the Archives and emptied paint powder on the case and on himself. Mr. Green made a statement mentioning the founding values of our country, an express reference to the U.S. Constitution. Therefore, these offenses offense "involved" the Shaw Memorial and the U.S. Constitution because they were the essential ingredients that animated Mr. Green's actions.

This interpretation is consistent with the broad purpose animating the addition of the Cultural Heritage Resource Guideline. U.S.S.G. § 2B1.5 was added to the Guidelines in 2002. As the Commission stated:

> This amendment reflects the Commission's conclusion that the existing sentencing guidelines for economic and property destruction crimes are inadequate to punish in an appropriate and proportional way the variety of federal crimes involving the theft of, damage to, destruction of, or illicit trafficking in, cultural heritage resources. The Commission has determined that a separate guideline, which specifically recognizes both the federal government's long-standing obligation and role in preserving such resources, and the harm caused to both the nation and its inhabitants when its history is degraded through the destruction of cultural heritage resources, is needed.

638.Amendment, FCJ Federal Sentencing Guidelines Manual Amendment 638 (11/1/13). The Commission further explained: "[t]he higher base offense level represents the Commission's determination that offenses involving cultural heritage resources are more serious because they involve essentially irreplaceable resources and cause intangible harm to society." *Id.*

Mr. Green has contended that the "cultural heritage resource" guideline does not apply because he neither intended to nor actually harmed the U.S. Constitution. This is beside the point. The cultural heritage resource guideline does not solely apply to offenses where a cultural heritage

resource was harmed or threatened. The Guideline applies to any offense "involving" a cultural heritage resource. If the U.S. Sentencing Commission had intended this guideline to solely apply to offenses where a cultural heritage resource was harmed or damaged, it easily could have said so. For example, the Commission could have crafted this provision to say: "if the offense *harmed*," "if the offense *damaged*," or even "if the offense *threatened to harm or damage*," a cultural heritage resource. It did not. Instead, it crafted a broader provision consistent with a desire to protect incredibly important cultural objects that included all offenses *involving* such objects.

This interpretation is consistent with the few cases construing this Guideline. In *United States v. Allen*, the Sixth Circuit interpreted this Guideline as applied to the theft of rare books. 516 F.3d 364, 365 (6th Cir. 2008). There, the defendants had conspired to steal rare books from a library. *Id.* The defendants attempted to take seven rare books from the library but were forced to leave two behind given the weight of the books. *Id.* at 368. All seven books were recovered unharmed and undamaged. *Id.* One defendant argued with respect to sentencing that there was no actual loss as all the objects were recovered undamaged. *Id.* at 371. Even though books were recovered unharmed and undamaged, the district court and Sixth Circuit both applied U.S.S.G. § 2B1.5. *Id.* at 376-379. Not only that, the Sixth Circuit found that the district court had erred by limiting its calculation of the offense level to the five books removed from the library and not to all seven that the defendants *attempted* to remove from the library. *Id.* Mr. Green's assertion that he should only be penalized for the actual loss suffered by the Archives and the American taxpayer is completely at odds with this decision.

Moreover, Mr. Green's assertion that his offense level should be limited to the Archive's restoration and cleanup costs misapplies this Guideline. If the offense "involved" a cultural

16

heritage resource, the offense level is driven by the value of the cultural heritage resource, not solely by the cost of restoration and repair. The Application Notes to U.S.S.G. § 2B1.5 indicate that value of the resource "shall include": (i) The archaeological value . . . (ii) The commercial value. . . ; (iii) The cost of restoration and repair." U.S.S.G § 2B1.5, Application Note 2. In other words, given the importance of these resources, the Guideline specifically calls for a broader valuation than one solely based on restoration and repair.

In *United States v. Haggerty*, the Fifth Circuit rejected the same argument advanced by Ms. Smith, specifically that the restoration value should control. No. 20-50203, 2021 WL 1827316 (5th Cir. May 7, 2021), *cert. denied,* 142 S. Ct. 759, 211 L. Ed. 2d 475 (2022). There, a defendant had poured red paint on a statute of an American Indian. *Id.* at *1. In sentencing the defendant using § 2B1.5, the court had relied upon the total value of the statute based on its purchase price ($92,000) rather than the repair cost ($1,800). *Id.* at *2. The defendant there argued, as Mr. Green does here, that where a resource "is restored to its prior physical condition, it is error to use the total value of that resource in calculating the offense level under USSG § 2B1.5; rather, the court should use the cost of restoration incurred in bringing the resource back to its prior condition." *Id.* at *9 (internal quotations omitted).

The Fifth Circuit found that this "argument plainly fails." *Id.* The Fifth Circuit found that there was no support in the text of the guideline suggesting that the restoration value should control: "There is nothing that suggests that 'the cost of restoration or repair" takes precedence over and obviates the other two valuations." *Id.* at 304. Further, the Fifth Circuit found that the Sentencing Commission's explanation for the new Guideline further undercut the defendant's arguments: "[T]he Commission makes it clear that the harm that it is concerned about when it

comes to the damage and destruction of cultural heritage resources is not purely (or even primarily) the resource's physical condition or monetary value. Rather, the purpose of § 2B1.5 is to provide 'flexibility' to appropriately *punish* offenders for both the tangible and *intangible* harm caused by their damage of cultural heritage resources." *Id.* The Fifth Circuit noted that the Commission had expressly elected not to use the concept of "loss," which was generally relied upon in property destruction cases: "The Commission has elected not to use the concept of 'loss,' which is an integral part of the theft, fraud, and property destruction guideline at § 2B1.1, because cultural heritage offenses do not involve the same fungible and compensatory values embodied in 'loss.'" *Id.* at *10. In conclusion, the Fifth Circuit found that the defendant's "argument would have us rewrite the text of § 2B1.5 in tension with the purpose behind its promulgation." *Id.* The Fifth Circuit rejected that invitation.   This Court has already rejected this invitation once.   It should do so again.

In essence, Mr. Green asks this Court to sentence him as if he entered the lobby of a federal building and caused thousands of dollars in damage to the waiting room. Mr. Green did not do that. Mr. Green specifically targeted two incredibly valuable cultural artifacts. As such, his offenses "involved" cultural heritage resources, and U.S.S.G. § 2B1.5 applies.

Because U.S.S.G. § 2B1.5 applies, the Government calculates the Sentencing Guidelines as follows:

| Damage to National Gallery of Art Exhibit (40 U.S.C. §§ 6303, 6307) | | |
|---|---|---|
| Base Offense Level | 8 | §2B1.5(a) |
| Value > $3.5M, <$9.5M | +18 | §2B1.5(b)(1), §2B1.1(b)(1)(M) |
| Cultural heritage resource was from a museum | +2 | §2B1.5(b)(2) |
| **Total:** | 28 | |

18

| Destruction of Government Property (18 U.S.C. § 1361) | | |
|---|---|---|
| Base Offense Level | 8 | §2B1.5(a) |
| Value > $25M, <$65M | +22 | §2B1.5(b)(1), §2B1.1(b)(1)(M) |
| Cultural heritage resource was from a museum | +2 | §2B1.5(b)(2) |
| **Total:** | 32 | |

These offenses group pursuant to §3D1.2(d).   Therefore, the Total Estimated Offense Level is 32.

While Mr. Green did not plead guilty pursuant to a plea agreement, he has accepted responsibility and is entitled to a 2-level reduction pursuant to U.S.S.G. § 3E1.1, and a further 1-level reduction pursuant to U.S.S.G. § 3E1.1(b). Additionally, Mr. Green qualifies as a zero-point offender pursuant to U.S.S.G. § 4C1.1.   Therefore, he is entitled to an additional two-point reduction.

As such, Mr. Green's total adjusted offense level is 27. Mr. Green has no criminal history and therefore has a criminal history category of I. With a total offense level of 27, and a criminal history category of I, Mr. Green's Guideline Range is 70 to 87 months' imprisonment. The Guideline range for supervised release is one to three years, U.S.S.G. § 5D1.2(a)(2), and the Guideline range fine is $25,000 to $250,000. U.S.S.G § 5E1.2.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mr. Green to two years' imprisonment, followed by three years of supervised release, with the condition that he continue to stay out of Washington, D.C., and not visit any museum. The Government also requests that Mr. Green and his co-conspirator pay restitution in the amount of $58,646.25. Upon his release, the Government requests that Mr. Green be required to perform 150 hours of community service.

This sentence provides a significant penalty to Mr. Green, commiserate with the severity of his offenses, his repeated disregard for this Court and its orders, and provides a significant deterrent to those who might imitate his crimes.

## I.    The Nature and Circumstances of Mr. Green's Offenses.

Mr. Green plotted with others to attack a piece of art. His actions were planned and purposeful. And his motivations were entirely political. Mr. Green believed—and based on his behavior while on pretrial release appears to still believe—that his political beliefs outweigh anything and everyone else. The Shaw Memorial which he targeted is a point of pride for many Americans. It specifically seeks to highlight the sacrifices of one of the first African American military units in our country's history. When Mr. Green smeared "Honor Them" along the exhibit he was doing the exact opposite. His careless and childlike actions did nothing to honor these brave men who sacrificed themselves for a cause greater than the individual. By contrast, Mr. Green elevated his own personal politics above everyone who might want to observe that mural in peace, disregarding the actual human beings who would have to spend their time scrubbing up his mess.

When Mr. Green attacked NGA, he was undoubtedly aware that this was the second such attack at NGA. These attacks have a cost. There is a cost to taxpayers for the cleanup and for the cost of enhanced security. There is a cost to visitors who endure that enhanced security. And there is a very real cost to NGA's employees. The employees of NGA did not ask to work at a place of employment under siege. Every time they hear or see something out of the ordinary, they are afraid and concerned that it might be yet another attack. These employees no longer feel safe in their workplace, particularly after Mr. Green's actions. Mr. Green and his co-conspirators have robbed NGA's employees of the basic and mundane expectation of feeling secure in their workplace.

His attack on the National Archives, while on supervision for his attack at NGA, is even more egregious. Mr. Green—completely undeterred by supervision and the threat of rearrest—entered the Archives with Mr. Zepeda and carelessly exploded paint powder over the case of the U.S. Constitution. Mr. Green had absolutely no concern about the harm that it could cause. He did not care that he could damage the priceless founding document of our country. He did not care that he could damage the similarly valuable case surrounding it. He did not care that he could damage the historical marble rotunda in which the Constitution was housed. He did not care about the terror he was inflicting on the employees of and visitors to the Archives, none of whom consented to being a part of Mr. Green's political theater.

When Mr. Green threw paint powder over the U.S. Constitution, he caused fear. The National Archives was forced to evacuate the visitors and many employees who were present that day. None of these individuals knew that this powder (which some inadvertently inhaled) was paint powder. Many undoubtedly feared that they were the subject of a chemical weapons attack, a phenomenon which was not uncommon in D.C. in the not-too-distant past.

When Mr. Green threw paint powder over the U.S. Constitution, he caused harm. Highly trained conservation staff responded to determine the nature of the powder and how to clean it from the priceless and historical Archives rotunda. Teams of people spent days on their hands and knees scrubbing slowly at the floor to undo what Mr. Green had done. It cost more than $50,000 in taxpayer money to clean up Mr. Green's destruction. The Archives have now taken steps to ensure similar offenses do not occur again, enhancing security screening at a cost to taxpayers and future visitors. The Archives was closed for four days, preventing hundreds of visitors from seeing our country's most cherished documents. None of the Archives employees, visitors, or taxpayers

asked to be part of Mr. Green's political commentary. And whatever message Mr. Green intended to send was swallowed whole by the fear and harm he inflicted.

What is particularly egregious about Mr. Green's conduct is that he was aware of the significant consequences he would face for committing this crime. By the time Mr. Green committed this offense, three other members of Declare Emergency had already been federally indicted. Mr. Green himself had just been charged and released eight days prior. The Honorable G. Michael Harvey explicitly told Mr. Green what would happen if he violated the conditions of his release. And Mr. Green lied to Judge Harvey, committing to conditions he never intended on fulfilling. Mr. Green committed this offense fully aware of the consequences. In fact, he chose to escalate prior attacks, not just focusing on a work of art, but targeting a document of singular importance to our country.

Mr. Green's offense merits a significant term of incarceration.

## II.    **Mr. Green's History and Characteristics.**

Unlike his co-defendant, Mr. Green has no criminal history. That is to his credit. But Mr. Green's involvement in these offenses reflects a striking and untethered willingness to engage in crime. Mr. Green has no ties with our community. He apparently moved to our community—and voluntarily made himself homeless—to engage in these offenses. He was even paid for it. And after being told to leave our community to return to where he has family or friends, he refused, violating the conditions of his release.

Mr. Green's repeated refusal to abide by release conditions is reflective of how he is likely to behave on supervised release. Mr. Green was given opportunity after opportunity by this Court. The parties and the Court spent hours engaged in the minutiae of where Mr. Green would stay,

where he could work, how he would transport himself, and who would look after him. Despite these efforts, Mr. Green flippantly tossed aside this labor, wasted the time of the Court and the parties, and declared that he simply would not abide by any conditions.   He treated two judges of this Court with the same disrespect that he did the Shaw Memorial, the Constitution, and the staff and visitors of NGA and the Archives.

Mr. Green's behavior on pretrial release, his decision to move to our community to commit crimes, and the lack of any mitigation in his history merits a significant term of incarceration.

### III.    <u>The Need for the Sentence Imposed.</u>

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. Mr. Green has engaged in repeated offenses despite explicit warnings from the Court and despite the Court going to great lengths to permit his compliance. In short, he has indicated that he will continue engaging in these offenses regardless of the consequences. Therefore, a period of specific deterrence is required. The requested sentence will prevent Mr. Green from harming our community and others for a period of time.

The requested sentence will also provide general deterrence. Since this Court sentenced Declare Emergency member Joanna Smith there has been a significant impact on Declare Emergency "actions." The Court's sentence significantly impacted Declare Emergency's ability to recruit new members and engage in offenses. There has not been an attack since that sentence. Mr. Green was apparently recruited by Declare Emergency, was paid, and moved to D.C. for the purpose of engaging in these offenses. That behavior must be deterred. Sentencing Mr. Green to a significant period of incarceration will indicate to any potential new members that their actions are not worth whatever Declare Emergency is willing to pay.   These offenses are serious and will

result in serious consequences.

Finally, a significant period of incarceration will provide Mr. Green an opportunity to reflect and choose a direction for his life. Mr. Green is educated and has vocational training. Despite that, he is listlessly roaming, engaging in crime. A period of incarceration will hopefully allow him to take advantage of vocational or education training or at the very least motivate himself to do something other than committing crimes in a jurisdiction to which he has no ties.

## **CONCLUSION**

For all of the foregoing reasons, the Government requests a sentence of two years' imprisonment, followed by three years of supervised release, to include community service, a continued stay-away from Washington, D.C. and museums, and restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov